**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**JASPER DIVISION**

| | | |
|---|---|---|
| **CHADWICK THAXTON** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.:  6:19-cv-02035-RDP** |
| | } | |
| **ANDREW SAUL, Commissioner of** | } | |
| **Social Security Administration** | } | |
| | } | |
| **Defendant.** | } | |

**<u>MEMORANDUM OF DECISION</u>**

Plaintiff Chadwick Thaxton brings this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act (the "Act"), seeking judicial review of the decision of the Commissioner of Social Security ("Commissioner") denying his claims for a period of disability, disability insurance benefits ("DIB"), and Supplemental Security Income ("SSI"). *See* 42 U.S.C. §§ 405(g) and 1383(c). Based on the court's review of the record and the briefs submitted by the parties, the court finds the decision of the Commissioner is due to be affirmed.

**I.     Proceedings Below**

On March 17, 2017, Plaintiff filed applications for disability, DIB, and SSI, which alleged he was disabled beginning on March 1, 2017. (Tr. 92, 94, 163-77). On April 28, 2017, Plaintiff's applications were initially denied by the Commissioner. (Tr. 71-91, 93, 95-99). Plaintiff filed a timely request for a hearing before an Administrative Law Judge ("ALJ") to contest the denial of benefits. (Tr. 101-13). After Plaintiff's request was granted, a hearing was held before ALJ Patrick R. Digby on August 15, 2018. (Tr. 32-70).

The ALJ returned an unfavorable decision for Plaintiff on February 6, 2019, concluding Plaintiff was not disabled under §§ 216(i) and 223(d) nor § 1614(a)(3)(A) of the Act. (Tr. 14-31). Plaintiff sought review of the ALJ's decision from the Appeals Council, but that request was summarily denied on November 8, 2019, making the decision of the ALJ final on behalf of the Commissioner. (Tr. 1-3). Plaintiff now brings a civil action to this court seeking review of the denial of benefits pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

II.    **Facts**

Plaintiff has a high school education and last worked on February 15, 2014. (Tr. 206-07). Plaintiff was 47 years old when he filed his applications for benefits. (Tr. 164, 168). He claims he is generally disabled because of various conditions, including degenerative disc disease, back pain, neck pain, shoulder pain, neuromuscular bladder dysfunction ("neurogenic bladder"), depression and anxiety. (Tr. 38, 46, 48-57, 75, 85, 206).

Plaintiff testified he has "good days" and "bad days." (Tr. 46-48, 59). His pain is the determining factor, and he says a day can go from good to bad with a twist, bend, or motion in the wrong direction. (Tr. 46-48). On a good day, Plaintiff can sit and stand for 30 to 90 minutes intermittently without needing to lay down and he can help with minor chores around the house with little or no assistance. (*Id.*). However, on bad days, Plaintiff may need to lie down most of the day. (*Id.*). Plaintiff estimates he has bad days usually "a couple days a week." (Tr. 48). These bad days are sometimes compounded by a need to self-catheterize "twice a week or more" due to his neurogenic bladder condition. (Tr. 49-50). While performing this procedure, Plaintiff wears no pants and only a shirt, using a sheet to cover himself. (*Id.*). According to Plaintiff, this procedure usually takes about a day "to make sure it gets totally flushed out." (*Id.*). On these days, he testified he really cannot do anything. (*Id.*).

Plaintiff stated his "life has changed dramatically" since the onset of his conditions. (Tr. 230). Plaintiff lives in a mobile home with his girlfriend, her two children ages 12 and 21, and his girlfriend's mother. (Tr. 36-37, 223-38). At home, Plaintiff rarely helps with household chores, but sometimes will help with the dishes. (Tr. 38). He is able to watch TV and movies (for limited periods before needing to readjust), use the remote control, talk on the phone, open doors, feed himself, and brush his teeth. (Tr. 60, 227). However, he is unable to tie his shoes, use the dryer, push a lawnmower, pull food out of the oven, dust, stir food, or sweep. (Tr. 38, 60, 225). Further, Plaintiff testified he rarely leaves his home due to his conditions and a fear they may worsen. (Tr. 40). At most, Plaintiff leaves his home 2-3 times per week. (Tr. 226). Plaintiff goes out to eat approximately "once or twice a month," and sometimes goes shopping for basic necessities. (Tr. 61, 226). However, he does not like to do so alone, particularly since a 2017 grocery store incident when, after "pull[ing] [his] back the wrong way" while reaching for a shelved item, he had to be assisted by customers until the episode passed. (Tr. 40-41). Whenever Plaintiff does leave, he drives one of his girlfriend's two cars. (Tr. 40).

Plaintiff's last significant employment ran from February 2005 to February 2014 with New Process Steel where he worked as a steel mill worker and later as an informal supervisor of the mill's stamping department. (Tr. 38-40, 242-45). Prior to working at New Process Steel, he worked as a delivery driver, a septic tank servicer, and maintenance man. (Tr. 43-46, 62-63, 186-94, 242). Plaintiff testified his employment at New Process Steel ended when he was terminated in 2014 after his FMLA[1] ran out. (Tr. 39, 186). He has had no income since his termination and has not filed for unemployment. (Tr. 39-40). Plaintiff is supported financially by his girlfriend and her mother. (Tr. 37).

---

[1] "Family Medical Leave Act." *See* https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/employeeguide.pdf

Plaintiff stated he was placed on family and medical leave by Dr. Eugene Tai, from whom Plaintiff has sought treatment for chronic back pain since at least 2008. (Tr. 39, 408-09). Dr. Tai is also the prescribing physician for Plaintiff's medications, which include 7.5 Lortab, Xanax, Buspirone, and Methocarbamol. (Tr. 42). Plaintiff stated he has been prescribed opiates for pain since at least 2005-06. (Tr. 43).

Plaintiff's medical records are extensive, encompassing various complaints he has presented at several facilities as early as 2009. (Tr. 273). In January 2009, Plaintiff sought treatment at Urgent Care Northwest for insomnia, complaining of an inability to sleep, and high stress. (*Id.*). The earliest medical record relating to Plaintiff's back pain is dated April 8, 2009 (also at Urgent Care Northwest). (Tr. 272). In June 2009, Plaintiff returned to Urgent Care Northwest for treatment with anxiety, nervousness and complaints of inability to sleep. (Tr. 270). The next reference to Plaintiff's back pain relates to a February 2011 trip to Urgent Care Northwest, where he received a diagnosis of acute lower back pain. (Tr. 271).

In July 2012, Plaintiff was admitted to the Walker Baptist Medical Center Emergency Department for back pain, emesis, and dysuria. (Tr. 332-45). During this visit, Plaintiff submitted a urine sample on his own and lab tests indicated no concerns. (*Id.*). Plaintiff also underwent a CT scan, which in relevant part showed no urolithiasis or obstructive uropathy. (*Id.*). Plaintiff next sought care in May 2013, again at Walker Baptist, complaining of nausea, abdominal pain, and back pain. (Tr. 346-63). No genitourinary symptoms were indicated during this visit. (*Id.*). Lab work, a urinalysis, and a CT scan were all performed, with results confirming in relevant part that there was no urolithiasis or obstructive uropathy, but the testing indicated a small adenoma and probable mild hepatic steatosis. (*Id.*). Plaintiff was prescribed Percocet for his pain and discharged the same day. (*Id.*).

Less than one month later, in June 2013, Plaintiff returned to Walker Baptist complaining of back pain, which he said was the result of skiing the day before. (Tr. 364-73). He was diagnosed with a back strain, given anti-inflammatory and muscle relaxing injections, prescriptions for Ultram, Advil, and Flexeril and discharged. (*Id*.). Shortly thereafter, in August 2013, Plaintiff again sought treatment for back pain at Walker Baptist after falling at work. (Tr. 374-81). He was diagnosed with a back sprain, prescribed Flexeril and Tramadol, and discharged. (*Id*.).

In November 2013, Dr. Tai instructed Plaintiff to undergo an MRI for further evaluation and referred him to Dr. Carter Harsh of Neurosurgical Associates. (Tr. 275-79, 383-85). The results of the MRI are best summarized by Dr. Harsh: "lumbar MRI scan reveals degenerative disc changes throughout the lumbar spine with some sparing at the L2-3 level. There is a right L5-S1 disc rupture which may be at least partially calcified." [2] (Tr. 275-79). In December 2013, Dr. Harsh met with Plaintiff and discussed treatment options. (*Id*.). Plaintiff decided to pursue a physical therapy regiment (three times per week for four weeks) and agreed to follow up with Dr. Harsh upon completion. (Tr. 277). Plaintiff began physical therapy on December 11, 2013, attending nine appointments with varying results over a three-week period. (Tr. 280-308). Physical therapists noted that Plaintiff had "excellent" potential for rehabilitation. (*Id*.). However, Plaintiff did not attend his last week of appointments and the record does not indicate he made any attempts to continue. (*Id*.).

Medical records submitted by Dr. Tai for Plaintiff's five visits from March 2015 to February 2017 indicate many of the same complaints previously discussed. (Tr. 309-24). Among his complaints were chronic back pain with occasional radiation into his legs, insomnia, anxiety,

---

[2] Included in the results of the MRI was a diagnosis of Lumbago, as well as chronic degenerative disc disease at the L4-L5 and L5-S1 posterior central and right paramedian HNP with associated central canal stenosis and right lateral recess effacement by extruded disc content. (Tr. 383-85).

and depression. (*Id*.). Throughout this period, Dr. Tai continued to prescribe medication, noting Plaintiff was stable with medication and had suffered no new or recent injuries. (*Id*.). Of further relevance during this period were negative straight leg tests in August 2015, January 2017 and February 2017, as well as Dr. Tai continually noting a normal range of motion for all extremities. (*Id*.). In February 2017, Plaintiff complained to Dr. Tai about an inability to void himself and Dr. Tai diagnosed Plaintiff with neuromuscular bladder dysfunction.[3] (*Id*.). Dr. Tai referred Plaintiff to a urologist, but the record does indicate Plaintiff ever went to one. (*Id*.). This record does indicate Plaintiff visited the hospital on February 14, 2017, related to this complaint, but the records of that visit are not included in the records before the court. (Tr. 320-22).

However, on February 19, 2017, Plaintiff went to Walker Baptist after discovering blood on his urinary catheter. (Tr. 386-403). Plaintiff received assistance with his catheter and instructions on how to properly use it at home. (Tr. 387, 441, 458-59). Walker Baptist records note Plaintiff insisted on catheter removal after an hour because "he was unable to tolerate [it]" and that he had a normal range of motion. (Tr. 390-91).

The final medical record before the court is from May 12, 2018, and it is the only hospital or medical visit during the period of adjudication. (Tr. 470-93). Plaintiff sought treatment for neck pain after a vehicle in which he was a passenger hit a pothole. (*Id*.). Plaintiff reported numbness, tingling, and weakness in his right arm, and the clinical impression of the emergency department was potential cervical radiculopathy. (*Id*.). This record also noted normal range of motion and no mention of genitourinary concern. (*Id*.). Plaintiff was prescribed a Medrol Dosepack and Norflex, and was discharged. (*Id*.).

---

[3] The ALJ classified and refers to Plaintiff's neuromuscular bladder dysfunction (or neurogenic bladder) as a "genitourinary complaint" throughout the decision. (Tr. 14-31).

III.    **ALJ Decision**

Disability under the Act is evaluated by a five-step sequential evaluation. 20 C.F.R. § 404.1520. During steps one through three, the claimant carries the burden of proving he is disabled. 20 C.F.R. § 404.1512(a).

First, the ALJ determines whether the claimant is engaging in substantial gainful activity ("SGA"). 20 C.F.R. § 404.1520(a)(4)(i). Substantial gainful activity may consist of "substantial work activity," which is work activity involving significant physical or mental activities, and/or "gainful work activity," which is work usually done for pay or profit. 20 C.F.R. § 404.1572(a-b). If an individual engages in substantial gainful activity, the claimant is not disabled and cannot claim disability. 20 C.F.R. § 404.1520(b).

Second, the ALJ determines whether the claimant has a medically determinable impairment that is "severe" or a combination of medical impairments that are "severe." 20 C.F.R. 404.1520(c). An impairment is "severe" if it significantly limits the claimant's ability to perform basic work activities. *Id. See also*, 20 C.F.R. § 404.1520(a)(4)(ii). Absent severe impairment, a claimant is not disabled. 20 C.F.R. § 404.1520(a)(4)(ii).

Third, the ALJ determines whether the claimant's impairment or combination of impairments is of a severity to meet the criteria listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926. If such criteria are met, and the criteria satisfy the duration requirement listed in 20 C.F.R. § 404.1509, the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ may still find disability under the next two steps of the analysis. Before proceeding to step four, the ALJ determines the claimant's residual functional capacity ("RFC"),

which refers to the claimant's ability to do physical and mental work activities despite the limitations of the impairment(s). 20 C.F.R. § 404.1520(e). An RFC determination is based upon all the relevant medical and other evidence contained in the case file. *Id*. *See* 20 C.F.R. § 404.1545.

Using the RFC assessment, the ALJ proceeds to step four, determining whether the claimant has the necessary RFC to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the claimant can still do past relevant work, the claimant is not disabled. *Id*.

If a claimant is unable to perform past relevant work, the analysis proceeds to step five, where the ALJ again uses the RFC assessment, along with considerations of the claimant's age, education and work experience, to determine whether the claimant can make adjustments to perform other commensurate work. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines the claimant is able to make adjustments and do other work, he is not disabled. *Id*. In order to support a finding of not disabled at this step, the burden of proof shifts to the ALJ to prove the existence, in significant numbers, of jobs in the national economy that the claimant can perform. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, the ALJ determined Plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability, March 1, 2017. (Tr. 19). Next, the ALJ determined Plaintiff suffers from three severe impairments: obesity, degenerative disc disease, and male genitourinary complaint. (*Id*.). Based on the record, the ALJ further determined these medically determinable impairments were significant limitations on Plaintiff's ability to perform basic work activities. *See* SSR 85-28. However, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that meet or medically equal the severity of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (Tr. 21). The ALJ found Plaintiff's degenerative disc disease did not satisfy a necessary listing under 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 1.04 for disorders

of the spine. (*Id*.). Specifically, the ALJ stated Plaintiff did not satisfy listing 1.04(A) because the record did not contain evidence of nerve root compression, did not satisfy listing 1.04(B) because the record did not contain spinal arachnoiditis, and did not satisfy listing 1.04(C) because there was no evidence of pseudoclaudication. (Tr. 21, 383-85). This determination was reached in connection with an elective MRI which Plaintiff underwent on November 13, 2013. (Tr. 279, 383-85). As to Plaintiff's genitourinary complaint, the ALJ determined it failed to meet any of the genitourinary listings under 20 C.F.R. § 404, Subpart P, Appendix 1, Listing 6.00. (Tr. 21). The ALJ reviewed a CT scan from May 17, 2013, to reach this conclusion. (Tr. 357). This scan showed no evidence of obstruction of the kidneys, no urolithiasis, and no obstructive uropathy. (Tr. 357). Further, there is no evidence in the record to indicate a diagnosis of a kidney disease. (Tr. 21). As to Plaintiff's obesity, the ALJ determined that while no specific listing was applicable, Plaintiff's obesity, either alone or in combination with other impairments, did not rise to the level of a listed impairment. (Tr. 21).

Before proceeding to step four, the ALJ determined Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with some exceptions.[4] The ALJ used the prescribed two-step evaluation process and concluded that while Plaintiff's medically determinable impairments could reasonably be expected to cause the symptoms, his statements

---

[4] As the ALJ concluded: "After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except [Plaintiff] can occasionally lift and/or carry, including upward pulling of 20 pounds, with occasionally meaning up to 1/3rd of an eight-hour workday; frequently lift and/or carry, including upward pulling of 10 pounds, with frequently meaning up to 2/3rd of an eight hour workday. [Plaintiff] can stand and/or walk, with normal breaks, for six hours in an eight hour workday; sit, with normal breaks for six hours in an eight hour workday; the ability to push and/or pull through the operation of hand or foot controls is unlimited up to the lift and carry restrictions of 20 and 10 pounds; [Plaintiff] can occasionally climb ramps and stairs, occasionally balance, stoop, kneel, and crouch; no work on ladders, ropes, or scaffolds; no crawling; no heavy vibratory types of jobs, such as using a jackhammer or similar; and no work at unprotected heights or around dangerous moving machinery." (Tr. 21-22).

with regard to the intensity, persistence, and limiting effects related to his conditions were not consistent with the record evidence. (Tr. 22-23).

At step four, the ALJ considered Plaintiff's prior work history as a stamping press tender, delivery driver, septic tank servicer and maintenance man, and whether Plaintiff could still perform this work. (Tr. 25-26). Based on the record and the testimony of the vocational expert ("VE"), the ALJ determined that Plaintiff was unable to perform his relevant past work. (*Id*.).

At step five, the ALJ considered Plaintiff's age, education, work experience, and RFC in determining that jobs existed in significant numbers in the national economy that Plaintiff could successfully adjust to and be able to perform. (Tr. 26). *See* 20 C.F.R. §§ 404.1569, 404.1569(a), 416.969 and 416.469(a). In reaching this conclusion, the ALJ posed questions to the VE who testified that given all of the factors present, the individual would be able to perform jobs with light exertional level and that such jobs existed in significant numbers in the national economy. (Tr. 26). Among these occupations were assembler, wire worker, and inspector/checker. (Tr. 26-27). The ALJ determined Plaintiff was not disabled because work existed in significant numbers that he was capable of adjusting to and performing.

## IV.    Plaintiff's Argument for Remand or Reversal

Plaintiff contends substantial evidence does not support the ALJ's findings and the ALJ erred in reaching this decision for four reasons. Plaintiff alleges the ALJ failed to: (1) consider the effects of his neurogenic bladder; (2) consider his lack of finances in seeking medical care for his condition(s); (3) consider the effects of his cervical nerve impingement; and (4) pose a hypothetical question to the VE comprising all of his impairments. (Pl. Br. at 1).

## V.      Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied. *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Title 42 U.S.C. § 405(g) mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

The district court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; rather, it must review the final decision as a whole and determine if the decision is supported by substantial evidence. *See id.* (citing *Bloodsworth*, 703 F.2d at 1239).

## VI.     Discussion

Plaintiff seeks review of the Commissioner, alleging the ALJ "ignored the substantial evidence presented in this case in order to produce an unfavorable decision." (Pl. Br. at 5). Plaintiff further argues that, as a result of the ALJ's decision being based on insubstantial evidence, he was denied due process. (*Id.*).

**A.      The ALJ considered and discounted subjective testimony regarding Plaintiff's neurogenic bladder and, because Plaintiff's subjective testimony was unsupported, it was properly excluded from the VE's hypothetical.**

Plaintiff makes two separate (but related) arguments relating to his neurogenic bladder. First, Plaintiff argues the ALJ failed to consider the effects of his bladder condition – particularly, the work-related limitations resulting from his need to self-catheterize. (Pl. Br. at 2, 8-10). Second, Plaintiff argues the ALJ failed to pose appropriate hypothetical questions comprised of all impairments to the vocational expert – particularly, with regard to his neurogenic bladder and the "work-related limitation[s] of function." (Pl. Br. at 4-5, 14-15). Both claims are rooted in the ALJ's decision to discredit Plaintiff's subjective testimony regarding this condition. However, the ALJ's findings were supported by substantial evidence and he adequately articulated in the decision.

At step two of the sequential analysis, the ALJ determined Plaintiff's genitourinary impairment to be severe. (Tr. 19). *See* 20 C.F.R. § 404.1520(c). However, at step three, the ALJ determined that impairment did not meet or medically equal any of the listings under 6.00 (Genitourinary Disorders) in 20 C.F.R. Part 404, Subpart P, Appendix 1.[5] (Tr. 21). *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926. Prior to proceeding to step four, the ALJ assessed Plaintiff's RFC, and concluded he was able to perform light work with some restrictions. (Tr. 21-22). Plaintiff argues the ALJ did not consider the work-related effects of his condition in making the RFC assessment. (Pl. Br. at 2, 8-10). At step five, the ALJ used the prior RFC assessment, along with considerations of Plaintiff's age, education and work experience, and determined Plaintiff could make adjustments to perform other commensurate work. (Tr. 26-27). *See* 20 C.F.R. § 404.1520. In doing so, the ALJ enlisted vocational expert Marcia Shulman,

---

[5] The ALJ noted substantial evidence to reach this conclusion including a CT scan from May 2013 revealing no urolithiasis, obstructive uropathy or other acute abdominopelvic process, a satisfactory glomular filtration rate (eGFR) and the fact that Plaintiff had not been diagnosed with kidney disease. (Tr. 21, 346-63).

and posed hypothetical questions regarding Plaintiff's impairments. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e). Based on her testimony, the ALJ determined there were significant numbers of jobs in the national economy that Plaintiff could perform. (Tr. 26-27). 20 C.F.R. §§ 404.1520(g), 404.1560(c). Plaintiff argues Shulman's testimony does not constitute substantial evidence because the ALJ failed to reference his neurogenic bladder, and its associated limitations, in the hypothetical questions posed to the VE. (Pl. Br. at 4-5, 14-15). The court disagrees.

Plaintiff contends his subjective testimony is consistent with medical evidence in the record, and therefore, "the standard is itself sufficient to support a finding of disability." (Pl. Br. at 10) (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). The Eleventh Circuit has established a test for evaluating pain and other subjective symptoms:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (noting the standard is also applicable to complaints of subjective conditions other than pain). Credibility determinations on subjective testimony are reserved for the ALJ, and the ALJ may refuse to credit subjective testimony so long as he "articulate[s] explicit and adequate reasons" for doing so. *Hale*, 831 F.2d at 1011.

A vocational expert's testimony constitutes "substantial evidence" if an ALJ properly poses hypothetical questions encompassing a claimant's impairments that are supported by the record. *Beegle v. SSA, Comm'r*, 482 Fed. Appx. 483, 487 (11th Cir. 2012) (citation omitted). *See* 20 C.F.R. § 1545(a)(2). An ALJ is not required to include findings which have been determined as unsupported when posing a question to a vocational expert. *Crawford v. Commissioner*, 363 F.3d 1155, 1161 (11th Cir. 2004).

Here, the ALJ determined that the extent of Plaintiff's purported need to self-catheterize and his subjective testimony regarding his condition were unsupported by the record. The ALJ articulated his reasons for making this finding and his finding was supported by substantial evidence. Therefore, there was no error in omitting this condition from the RFC analysis or from the hypotheticals posed to the vocational expert.

Plaintiff's neurogenic bladder condition does not satisfy the Eleventh Circuit's standard for evaluating pain and other symptoms. Only one of the necessary requirements is satisfied: evidence of an underlying medical condition. The record supports the existence of the condition based on a diagnosis made by Dr. Tai on February 16, 2017 and Plaintiff's visit to Walker Baptist on February 19, 2017, for a foley procedure after at-home complications. (Tr. 321, 434-93). Plaintiff's medical records from his Walker Baptist visit show he received instruction on proper home use of his catheter, and he verbalized his understanding. (Tr. 387, 441, 458-59). But, since this instruction was provided, the record does not show any further complications.

Plaintiff points to four records that he claims support his argument: (1) the November 2013 MRI, revealing an L5-S1 disc extrusion associated with an annular tear (Tr. 279); (2) Dr. Harsh's December 2013 assessment noting partial calcification of the L5-S1 (Tr. 277); (3) Plaintiff's visit to Walker Baptist in February 2017 relating to at-home catheterization concerns (Tr. 386-403, 439-69); and (4) invoices showing Plaintiff's purchase of catheters and urine bags, submitted in November 2018. (Pl. Br. at 9). But, Plaintiff does not explain in his brief how the first two records are relevant to the self-catheterization issue. The fourth may have relevance, but it is not cited in Plaintiff's brief, nor found in the record. And, the third speaks to the objective medical evidence of the underlying condition, but nothing more beyond that.

Plaintiff's subjective testimony supports the existence of the condition, but the severity of the condition is disputed. To manage it, Plaintiff testified he self-catheterizes, "sometimes twice a week or more." (Tr. 48). When doing so, Plaintiff stated, "he can't really do anything" because it takes "a day or so to make sure it gets totally flushed out," and he can wear only a shirt but no pants. (Tr. 48-50). Plaintiff's testimony as to the duration of use of catheters and urine bags is contradicted by the Walker Baptist records from his foley procedure in February 2017, which indicate the catheter was inserted for less than two hours before Plaintiff demanded removal. (Tr. 469).

Plaintiff has not presented objective medical evidence to support the severity of this condition, and thus has not satisfied parts 2(a)-(b) of the Eleventh Circuit's test. This lack of evidence indicating severity was in part the basis for the ALJ's decision to discredit Plaintiff's subjective testimony. As the ALJ noted, "[Plaintiff]'s medical record contains no evidence of medical visits to treat this condition within the period under adjudication." (Tr. 23). The period under adjudication, as assessed from the alleged onset date of March 17, 2017, shows only one medical visit in May 2018, and even that visit was not due to Plaintiff's bladder condition. (Tr. 23, 94, 163-67, 470-93). In fact, there is no explicit mention of any bladder condition concern on this date. (Tr. 473, 477). The ALJ also pointed to Plaintiff's prescriptions of Flexeril, Robaxin, Pyridium and Ultram, each of which were prescribed to manage back and genitourinary complaints. (Tr. 23, 478). Based on the lack of medical treatment and use of prescriptions, the ALJ concluded "these impairments appear to be well managed with medication." (Tr. 23). Because the ALJ determined Plaintiff's subjective testimony of intensity, persistence, and limiting effects of the condition were unsupported by the record, and because the ALJ adequately articulated his

reasons for discounting it, he was not required to include the condition or alleged effects in the RFC analysis, or the hypothetical questions posed to the VE. *See Crawford*, 363 F.3d at 1161.

The ALJ posed two hypothetical questions to the VE that did not include Plaintiff's alleged limitations regarding his neurogenic bladder for the reasons discussed above. (Tr. 62-69). During the hearing, the VE testified that not wearing pants while self-catheterizing at work "would be inappropriate for one thing…and certainly not tolerated in a competitive work situation." (Tr. 68). However, this does not constitute substantial evidence of Plaintiff's inability to work – only the common-sense conclusion that Plaintiff is likely unable to do so while self-catheterizing with no pants on. But again, this is a procedure that (by Plaintiff's own admission) is irregular and Plaintiff's characterizations about it are unsupported by objective medical evidence. Because the ALJ did not err in omitting the neurogenic bladder condition from the hypothetical questions posed to the VE, her testimony constitutes substantial evidence, which can be used to satisfy the Commissioner's burden at step five. *See Beegle*, 482 Fed. Appx. at 487. Accordingly, this record supports the ALJ's determination of no disability.

**B.**     **The ALJ did not fail to develop a full and fair record, and any error at step two was harmless because Plaintiff's claim proceeded to step three.**

Plaintiff next argues the ALJ failed to consider the effects of his cervical nerve impingement at C6-7. (Pl. Br. 4, 12-13). Specifically, Plaintiff argues the ALJ failed to develop a full and fair record and also failed to account for the severity of this impairment at step two. (*Id*.). The court disagrees.

Plaintiff's brief makes reference to an MRI from May 22, 2018, which "showed a disc bulge at C6-7 with severe right neural foraminal stenosis with probable impingement of the existing right C7 nerve root." (Pl. Br. at 4, 13) (internal quotations omitted). Plaintiff cites to other records to support his contention, but these records do not lend the support he contends. Rather,

these citations point to an MRI from November 2013, which does not show nerve impingement, nor make any mention of Cervical vertebrae at all. (Tr. 279, 323). Plaintiff's brief also references a June 4, 2018 medical note from Dr. Tai "showing [P]laintiff had limitations in [his] range of motion in the cervical spine." (Pl. Br. at 13). But, this assertion is not supported by any record citation.

The only mention in the record to Plaintiff's alleged C7 nerve impingement occurred during the ALJ hearing in response to a question from Plaintiff's counsel:

> "**Counsel**: Also, you're records – you've had – you've gone to Dr. Tai for a long time with low back pain and also neck pain.
>
> **Plaintiff**: Yes, sir.
>
> **Counsel**: In May of [2018], explain what happened. How – tell me how fragile you are.
>
> **Plaintiff**: We were going to – I think we were going to grab a bite to eat or something at Burger King or something. And they were doing roadwork, and [Deana Tucker] hit a pothole and didn't realize how hard she hit. And when we got there, and I started telling her, I was like, okay, Babe, listen, I'm hurting really bad. We've got to do something. And it was closer to go to the hospital than it was to go all the way back home and just kind of ride it out. I said, no something – this is not right. So she took me to the hospital, and they dealt with it.
>
> **Counsel**: You got an MRI done, correct?
>
> **Plaintiff**: Yes, sir.
>
> **Counsel**: And now you have a nerve impingement. I believe it's about C7.
>
> **Plaintiff**: I believe so, yes, sir."

(Tr. 50-51).

At the start of the hearing, Plaintiff's counsel affirmed he had reviewed the exhibits in the record and had no objections or additional submissions. (Tr. 35). The exhibit list is described on Form HA-L39 and represents the comprehensive record used by the ALJ in reaching his decision.

(Tr. 28-31). Form HA-L39 was provided to Plaintiff with the ALJ decision and to Plaintiff's counsel pursuant to request. (Tr. 9-31, 159-64). Between the issuance of the ALJ decision and request for review by the Appeals Council, the record was open for more than a year for additional record submissions. (Tr. 1-3, 14-31). However, the only record received by the Appeals Council during this time was counsel's informal request for review. (Tr. 9-13, 159-62).

On the HA-L39 form, the final record listed is May 18, 2018. (Tr. 31). Notably, this is four days prior to the May 22, 2018 date of Plaintiff's alleged MRI (Pl. Br. at 4, 13), and six days after the final entry contained in the record of May 12, 2018.[6] In addition, the final listed date on the HA-L39 form for Dr. Tai's testimony is June 4, 2018 (Tr. 31), the same date as the note allegedly showing limitations in Plaintiff's range of motion. (Pl. Br. at 13). However, the record does not include this note, and shows Dr. Tai's most recent assessment to be from 2014. (Tr. 419-33).

With this background in mind, the court turns to Plaintiff's arguments that (1) the ALJ failed to fully develop the record and (2) the ALJ erred at step two of the sequential analysis.

### 1.    The ALJ developed a full and fair record

It is well established that the ALJ has a "basic duty to develop a full and fair record." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). *See* 20 C.F.R. § 404.1512(d). This full and fair record is comprised of the twelve months preceding the date of the claimant's application. *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995). The claimant bears the burden of producing evidence in support of a claim. *Ellison*, 355 F.3d at 1276. *See* 20 C.F.R. § 416.912(a-c).

The ALJ's duty to develop the record typically does not apply to records outside the 12-month window prescribed by 20 C.F.R. § 416.912(b). *McCloud v. Barnhart*, 166 Fed. Appx. 410,

---

[6] This entry relates to Plaintiff's visit to Walker Baptist seeking treatment for neck pain after a vehicle in which he was a passenger hit a pothole. (Tr. 50-51, 470-93).

418 (11th Cir. 2006) (holding in part the ALJ did not err in failing to subpoena evidence alleged to exist outside the 12-month period and not included in the record, because the claimant is "in the best position to inform the ALJ as to [his] treatment history," and by failing to do so, claimant did not meet [his] burden of production). *See also*, *Osborn v. Barnhart*, 194 Fed. Appx. 654, 668-69 (11th Cir. 2006) (holding in part the ALJ did not err in failing to recontact the claimant's physician for additional and allegedly missing medical records when the ALJ had properly made a request for "all" medical records, the records in question were not included, and the claimant, who was represented by counsel, did not request clarification nor object to the evidence in the record as inadequate).

Remand of an ALJ decision for failure to develop a full and fair record is warranted when a claimant demonstrates evidentiary gaps resulting in "unfairness or clear prejudice." *Smith v. Comm'r of Soc. Sec.*, 501 Fed. Appx. 875, 878 (11th Cir. 2012) (*citing Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997)). Evidentiary gaps may "exist when omitted medical records are relevant to the applicant's claim of disability and the missing evidence might sustain the contention of an inability to work." *Rothfeldt v. Acting Comm'r of the SSA*, 669, Fed. Appx. 964, 967 (11th Cir. 2016) (*citing Shalala*, 44 F.3d at 935-936). If omitted evidence constitutes an evidentiary gap but does not otherwise affect an ALJ's informed decision, it will not result in clear prejudice. *Bellew v. Acting Comm'r of Soc. Sec.*, 605 Fed. Appx. 917, 932-33 (11th Cir. 2015) (explaining an ALJ's error in failing to fill an evidentiary gap is harmless and non-prejudicial when such evidence would not change the disposition).

Here, Plaintiff filed his application on March 17, 2017. (Tr. 92, 94, 163-77). Thus, the ALJ's duty to develop a full and fair record applies to the twelve months from March 17, 2016 to March 17, 2017. *See Shalala*, 44 F.3d at 934. The missing records referenced in Plaintiff's brief

are outside of that twelve-month period. *See McCloud*, 166 Fed. Appx. at 418. Because Plaintiff carries the burden of production, particularly in regard to records outside the twelve-month period, any failure of submission is the fault of Plaintiff. This is particularly true in the present case because Plaintiff's counsel made no objection to the HA-L39 exhibit list when given the opportunity to do so at the start of the ALJ hearing. (Tr. 35). *See Osborn*, 194 Fed. Appx. at 668-69. The HA-L39 exhibit list did not include records of the May 22, 2018 MRI. (Tr. 28-31).

Putting aside the point that the referenced evidence was outside the twelve-month period, even if the ALJ had failed to fill an evidentiary gap in this case (and, to be clear, he did not), the error was harmless and did not result in prejudice to Plaintiff. This is because, even taking as true Plaintiff's proffered evidence, it would not change the result of the ALJ's decision.

There is no dispute Plaintiff suffers from degenerative disc disease, and the ALJ classified this impairment as severe. (Tr. 19). However, the ALJ determined Plaintiff's degenerative disc disease did not meet a listing in 1.04 of 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the record does not describe evidence of nerve root compression, as required by 1.04(A)."). (Tr. 21). Listing 1.04(A) states in relevant part:

> "1.04   *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:
> A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);"

20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04(A).

To satisfy 1.04(A), a claimant must show (1) "evidence of nerve root compression characterized by nuero-anatomic distribution of pain; (2) limitation of motion of the spine; (3) motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by

sensory or reflex loss and, (4) if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." (internal quotations omitted).

The May 22, 2018 MRI showing "probable impingement of the right C7 nerve root," along with a characterization of nuero-anatomical distribution of pain[7] from Plaintiff's visit to Walker Baptist on May 12, 2018, satisfies the first requirement under 1.04(A). (Pl. Br. at 4, 13) (Tr. 51). Arguably, Dr. Tai's June 2018 letter may satisfy the second requirement because it describes "limitations in [his] range of motion in the cervical spine." (Pl. Br. at 13). However, records from Plaintiff's May 12, 2018 Walker Baptist visit note he had normal range of neck and musculoskeletal motion. (Tr. 474, 479). Listing 1.04(A) states as a third requirement that a claimant must experience "motor loss (atrophy associated with muscle weakness or muscle weakness) accompanied by sensory or reflex loss." *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04(A). The record is scarce of evidence describing motor loss, though not altogether void.  Plaintiff had some numbness, tingling and mild weakness in the right arm on May 12, 2018, during his examination at Walker Baptist. (Tr. 470-93). However, discharge instructions directed him to perform only light activity and to return as needed. (Tr. 485). The fourth requirement of 1.04(A) – a positive straight leg test (sitting and supine) – applies only when the condition at issue involves the lower back. Plaintiff's lower back was not specifically treated on May 12, 2018, and it can hardly be said that it was "involved" at that point as the totality of the record indicates this as his chief complaint from as early as 2009. (Tr. 272). Plaintiff has had three negative straight leg tests in August 2015, January 2017, and February 2017. (Tr. 309-24).

---

[7] Medical characterization of nuero-anatomical distribution of pain is cervical radiculopathy, and this was noted as a clinical impression by Walker Baptist staff during Plaintiff's May 12, 2018 visit to the emergency department. (Tr. 470-93).

The ALJ properly developed the record for the twelve months preceding Plaintiff's application for benefits. The missing records were not within the twelve-month period, and the ALJ did not err in failing to reference them because he did not have them to reference. Plaintiff had several months to submit these records and bore the burden of doing so. Simply put, there is no error by the ALJ for failing to consider unsubmitted evidence. Further, even if the missing records constituted an evidentiary gap, the gap did not result in prejudice because there is no indication that their inclusion would not change the outcome, and the ALJ otherwise made an informed decision. Therefore, even if there was error by the ALJ to fill the gap (and, again, Plaintiff has not shown that), it was harmless. Plaintiff's claim that the ALJ failed to develop the record is without merit.

### 2.     Any error at Step-Two was harmless

Plaintiff also alleges the ALJ failed to consider the cervical nerve impingement at step two of the sequential evaluation process. Even if the missing evidence did exist, and even if it was included in the record, such a failure would be harmless because other severe impairments were determined, allowing Plaintiff to proceed to step three.

Step two of the five step sequential analysis "acts as a filter" to screen out *de minimus* impairments. *Medina v. SSA*, 636 Fed. Appx. 490, 492 (11th Cir. 2016) (*citing Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987)). At step two, a finding of "any severe impairment is sufficient for the ALJ to proceed to the next step." *Flemming v. Comm'r of the SSA*, 635 Fed. Appx. 673, 675 (11th Cir. 2015) (citation and internal quotations omitted). *See Jamison*, 814 F.2d at 588 ("if no severe impairment is shown the claim is denied, but the finding of any severe impairment … is enough to proceed with the rest of the five-step analysis."). An ALJ who fails to consider an impairment "severe" at step two commits only harmless error, so long as other impairments rising

to the level of "severe" exist, allowing the analysis to proceed to step three. *Medina*, 636 Fed. Appx. at 492-93; *Flemming*, 635 Fed. Appx. at 675.

The law in the Eleventh Circuit is clear on this point. Because the ALJ determined Plaintiff had three "severe" impairments (obesity, degenerative disc disease, and male genitourinary complaint), the analysis continued on to step three. (Tr. 19). As the Eleventh Circuit has indicated in *Medina* and *Flemming*, preclusion of one allegedly "severe" impairment in the presence of others is subject to harmless error because the claim will continue to the next step. 636 Fed. Appx. at 492-93; 635 Fed. Appx. at 675.

### C.   The ALJ inquired into Plaintiff's financial condition and articulated his reason for discounting subjective testimony

Plaintiff also alleges the ALJ lacked substantial evidence to support his finding of no disability because the ALJ discredited subjective testimony regarding his inability to pay without "articulat[ing] explicit and adequate reasons for doing so." *Hale*, 831 F.2d at 1011. Plaintiff asserts that "given [his] testimony, the [ALJ] had the obligation to actually look into [his] explanation as to his inability to afford medical care–but the ALJ in our case made no such inquiries, and instead used the lack of medical treatment as a reason to discount the [his] creditability…." (Pl. Br. at 12). The court disagrees.

An ALJ "cannot draw an adverse inference from a claimant's infrequent medical treatment without considering explanations for the infrequency." *See* SSR 16-3p, 2016 SSR LEXIS 4. Among the explanations to be considered are a claimant's inability to afford treatment or lack of access to free or low-cost services. *See id*. Further, a claimant's poverty may excuse noncompliance with medical treatment. *See generally*, *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988). Therefore, before denying an application based on a claimant's failure to comply with prescribed medical care, the ALJ must consider whether the claimant is able to afford the

23

medical care. *Ellison v. Barnhart*, 355 F.3d at 1275. However, if failure to follow or seek medical care "is not one of the principal factors in the ALJ's decision," then such a decision will not constitute reversible error. *Brown v. Comm'r of Soc. Sec.*, 425 Fed. Appx. 813, 817 (11th Cir. 2011).

Plaintiff relies heavily on *Brown v. Social Security Administration*, 2019 WL 1296325 (N.D. Ala. 2019). But *Brown*, while similar to this case in some respect, is distinguishable. In *Brown*, the court reversed and remanded the decision of the Commissioner to deny benefits in relevant part because "the ALJ's reliance on Brown's infrequent attempts to seek medical treatment for purposes of discrediting his testimony regarding his pain was in error." The claimant made only one attempt to seek medical treatment for his alleged condition(s), and explained that "no one [would] see him without insurance." The ALJ's decision failed to discuss the possible reasons for the claimant's failure to seek medical treatment. That is, the ALJ did not address the claimant's explanation. The Commissioner conceded this error, but argued "it was harmless because the ALJ articulated independently adequate reasons for discrediting Brown's testimony regarding his pain." The court rejected the Commissioner's harmless error defense.

Unlike the situation in *Brown*, the ALJ in the present case addressed Plaintiff's explanation and testimony that he was unable to afford medical care. (Tr. 24). The ALJ gave explicit and adequate reasons for discounting this testimony. This satisfied the standard for discrediting subjective testimony, *see Hale*, 831 F.2d at 1011, because the reasons were supported by substantial evidence apart from Plaintiff's claim that he was unable to pay and were not the principal factors in the ALJ's decision. *See Brown*, 425 Fed. Appx. at 817.  As the ALJ explained, "there is no indication in the record that [Plaintiff] has sought government-subsidized health care or sought health care and been turned down due to financial reasons." (Tr. 24). Further, in making

the necessary inquiry into Plaintiff's explanation, "the medical records fail to show [Plaintiff] sought or contacted any local Free Clinic or a reduced fee clinic." (*Id.*). The ALJ's decision instead attributes Plaintiff's lack of attempts to acquire medical assistance as being more consistent with the "symptoms not being of the frequency, duration, or severity to need routine medical monitoring or care." (*Id.*).

Plaintiff's own testimony and the record further contradict his claim that the ALJ did not inquire into his financial condition. In his testimony, Plaintiff stated in response to the ALJ's questioning, that his girlfriend and his girlfriend's mother provide financial support, including paying for his prescriptions. (Tr. 37, 42). And, during the period in which he says he had no income, Plaintiff made several trips to various doctors' offices, hospitals, and clinics to receive care in connection with his complaints. (Tr. 23, 39-40, 42, 274-324, 346-403, 434-93).

Substantial evidence does not support Plaintiff's argument that the ALJ failed to consider Plaintiff's testimony that he was unable to pay. The ALJ made the necessary inquiries and articulated explicit reasons for discrediting Plaintiff's testimony. Therefore, Plaintiff's argument is without merit.

**VI.   Conclusion**

The court concludes that the ALJ's determination that Plaintiff is not disabled is supported by substantial evidence and the proper legal standards were applied in reaching this determination. The Commissioner's final decision is therefore due to be affirmed. A separate order in accordance with this memorandum of decision will be entered.

**DONE** and **ORDERED** this February 26, 2021.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE